1

2

3

4

5

6

7

8                        **UNITED STATES DISTRICT COURT**

9                        **CENTRAL DISTRICT OF CALIFORNIA**

10

11   ROBERT VILLALOBOS,              ) Case No. EDCV 13-2373-JPR
                                     )
12                Petitioner,        )
                                     )
13           v.                      ) MEMORANDUM OPINION AND ORDER
                                     ) DENYING PETITION FOR WRIT OF
                                     ) HABEAS CORPUS
14   MARTIN D. BITER, Warden,        )
                                     )
15                Respondent.        )
                                     )

16   ─────────────────────────────

17                            **PROCEEDINGS**

18        On December 27, 2013, Petitioner filed a Petition for Writ

19   of Habeas Corpus by a Person in State Custody and a memorandum of

20   points and authorities, challenging his 2010 murder conviction

21   and requesting an evidentiary hearing.  (Pet. at 2; Mem. P. & A.

22   at 39.)[1]  The Court thereafter granted Petitioner's motion to

23   stay the case under <u>Kelly v. Small</u>, 315 F.3d 1063 (9th Cir. 2003)

24   (as amended), <u>overruling on other grounds recognized by</u> <u>Robbins</u>

25   <u>v. Carey</u>, 481 F.3d 1143, 1149 (9th Cir. 2007), so that he could

26   ─────────────────────

27        [1] Because the Petition and proposed First Amended Petition
     are not sequentially numbered, the Court uses the pagination from
28   its official Case Management/Electronic Case Filing system.

                                    1

exhaust additional claims in state court.  On August 11, 2014, the Court lifted the stay and directed Petitioner to file a motion for leave to amend the Petition.  On March 8, 2015, Petitioner did so; he also lodged a proposed First Amended Petition ("FAP") and consented to having a U.S. Magistrate Judge conduct all further proceedings in his case, including entering final judgment.  Respondent consented to proceed before a Magistrate Judge on April 2, 2015.

On April 8, 2015, Respondent opposed the motion to amend and moved to dismiss the original Petition as untimely.  On May 18, 2015, Petitioner filed an opposition to the motion to dismiss. On October 9, 2015, the Court denied Respondent's motion to dismiss, denied Petitioner's motion for leave to file the proposed FAP, and ordered Respondent to file an answer to the original Petition.

On November 2, 2015, Respondent filed an Answer and Memorandum of Points and Authorities.  On December 14, 2015, Petitioner filed a Reply.[2]

---

[2] In his Reply, Petitioner reasserts some of the claims he previously attempted to raise in his proposed FAP.  (Compare Reply at 4-5 (arguing that insufficient evidence showed that Petitioner was stabber), 4 (arguing that "the trial court erred in disallowing defense counsel to inquire about the particulars of Erik[] [Sauceda's] current felony matters as it unconstitutionally restricted Petitioner's right to confrontation"), 5 (arguing that trial court erred in preventing Petitioner from calling two witnesses who would have testified that Erik punched them in face) with Proposed FAP at 5, 26-31 (arguing that insufficient evidence showed that Petitioner was stabber), 59-61 (arguing that "the trial court erred in disallowing defense counsel to inquire about the particulars of Erik's current felony matters as it unconstitutionally restricted Petitioner's right to confrontation"), 57 (arguing that trial

1   For the reasons discussed below, the Court denies the
2   Petition and Petitioner's request for an evidentiary hearing and
3   dismisses this action with prejudice.

**PETITIONER'S CLAIMS**

5   I.   The trial court prejudicially erred in excluding the
6   testimony of the defense's proposed knife expert, violating
7   Petitioner's constitutional right to due process and to present a
8   defense.   (Pet. at 6; Mem. P. & A. at i.)

9   II.   Insufficient evidence supported the jury's finding that
10  the murder was willful, deliberate, and premeditated.   (Pet. at
11  6; Mem. P. & A. at i.)

**BACKGROUND**

13  On May 6, 2010, Petitioner was convicted by a Riverside
14  County Superior Court jury of first-degree murder.   (Lodged Doc.
15  9, 6 Clerk's Tr. at 1461-63.)   The jury found true the allegation
16  that Petitioner used a knife in committing his crime.   (<u>Id.</u> at
17  1464.)   On July 23, 2010, Petitioner was sentenced to 26 years to
18  life in prison.   (Lodged Doc. 9, 7 Clerk's Tr. at 1603-04; Lodged
19  Doc. 8, 15 Rep.'s Tr. at 2856-57.)

20  Petitioner appealed, raising the two claims in the Petition.
21  (Lodged Doc. 11.)   On July 17, 2012, the California Court of
22  Appeal affirmed the judgment.   (Lodged Doc. 14.)   Petitioner
23  filed a petition for review (Lodged Doc. 15), which the

24

25  court deprived Petitioner of fair trial by preventing him from
26  calling two witnesses who would have testified that Erik punched
    them in face).)   Because the Court already found that those
27  claims are untimely and do not relate back to the claims in the
    original Petition (<u>see</u> Oct. 9, 2015 Mem. Op.), it does not
28  address them here.

3

California Supreme Court summarily denied on September 19, 2012 (Lodged Doc. 16).

On September 11, 2013, Petitioner constructively filed a habeas petition in the state superior court, raising three claims not related to those in the Petition.[3] (Lodged Doc. 2.) On October 22, 2013, the superior court denied the petition. (Lodged Doc. 3.) On November 14, 2013, Petitioner constructively filed a petition in the state court of appeal, raising the same three claims as the earlier petition. (Lodged Doc. 4.) On December 4, 2013, the court of appeal summarily denied the petition. (Lodged Doc. 5.)

On April 20, 2014, Petitioner constructively filed a habeas petition in the state supreme court, raising claims that included one corresponding to ground two of the original Petition. (Lodged Doc. 6.) On July 9, 2014, the supreme court summarily denied the petition. (Lodged Doc. 7.)

**SUMMARY OF THE EVIDENCE**

Because Petitioner challenges the sufficiency of the evidence to support his conviction, the Court has independently reviewed the state-court record. See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997). Based on that review, the Court finds that the following statement of facts from the California Court of Appeal opinion fairly and accurately summarizes the evidence.

---

[3] Petitioner dated his petition "11-14-13" (Lodged Doc. 2 at 7) and "this 11 Day of 14, 2013" (id. at 34), but it was file-stamped by the state court on September 20, 2013 (id. at 1), and the proof of service states that he placed it in the mail on September 11 (id., attach. proof of serv.).

4

A. *The People's Case*

On August 28, 2008, the date of the murder in this case, George Hernandez (the victim), Eloy Luna, and Max Reyes were friends. Corina Vasquez was Reyes's girlfriend.

Manuel and Angelica Sauceda lived on North Torn Ranch Road in Lake Elsinore with their two sons, Erik and Cristian Sauceda, their two daughters, and their niece, Maria Guadalupe Sanchez Saucedo.[4] Edgar Gomez was Maria's boyfriend.

Erik and Luna had been high school friends. Erik was acquainted with Hernandez. [Petitioner] and Erik were friends.

The Triple Six Kings, also known as TSK, was a "tagging crew" that spray-painted graffiti in certain areas of Lake Elsinore. Out Causing Panic, also known as OCP or TRS (for Torn Ranch Street), was a rival tagging crew in that city.

Reyes was a member of TSK and was actively involved in its tagging activities. Erik and Cristian associated with members of the rival OCP tagging crew. Luna was aware of Erik's association with OCP.

About a week before August 28, 2008, OCP members drove by the home of a TSK member who was a friend of Luna and fired a gunshot in the air in front of the home.

_____

[4] Because the Sauceda family members share the same last name, the court of appeal referred to them by their first names. This Court does the same.

Erik was in the car with the OCP crew.

In another incident that occurred prior to the murder, OCP tagged the home of Jerry Martinez in Lake Elsinore, a mutual friend of Hernandez, Luna, and Reyes, while Martinez was in custody in juvenile hall. The home was tagged in four places with graffiti that said "OCP" and "TRS." Martinez's home was located a couple of blocks from the Saucedas' home.

On August 28, 2008, [Petitioner] visited Erik and Cristian at their home. [Petitioner] was wearing an Oakland Raiders jersey with a white muscle shirt underneath it. During the investigation that followed the murder, Erik told detectives in a recorded statement that [Petitioner] had a long knife that had a fixed stainless steel blade with small curves on it.[FN2]

> [FN2] At trial, Erik changed his story and claimed the knife was a clip-on pocket knife and he lied to the detectives when he described it as a curvy, fixed-blade knife.

Hernandez, Luna, and Reyes discussed the OCP's tagging of Martinez's home, which upset them. As a result of their being upset, Hernandez, Luna, and Reyes decided to cover up the graffiti and then confront Erik about both the tagging of Martinez's home and the OCP drive-by shooting.

Late that night, Vasquez drove Hernandez, Luna, and Reyes to North Torn Ranch Road, parked near the Saucedas'

6

home and stayed in the car after Hernandez, Luna, and Reyes got out and approached the house, where one of them politely asked Maria to get Erik because they wanted to speak with him.   Assuming the three men were Erik's friends, Maria replied that she would get him, and she then walked into the house through the front door.

Erik, followed a few minutes later by [Petitioner] and Cristian, came to the front doorway pointing a BB gun and angrily asked Hernandez, Luna, and Reyes, who were wearing hoodies, "Why are you here?"

Hernandez, Reyes, and Luna accused Erik of being involved in the tagging of Martinez's home.   Erik threw down the BB gun and confronted Hernandez.   Erik and Hernandez began pushing each other and then moved to the middle of the street, where they began fist fighting.

Erik punched Hernandez in the face, knocking him to the ground.   Erik then kicked him twice in the head and punched him in the stomach and ribs.   Neither Erik nor Hernandez used a weapon during the fight.

Luna punched Erik, knocking him down in the middle of the street.   Hernandez struggled to stand up and then walked across the street away from the fight and in front of Vasquez's car to a neighbor's house.

[Petitioner], who had returned to the Saucedas' house, brought the Saucedas' two pitbulls to the front door.   [Petitioner] was holding a knife with a four-inch blade.   [Petitioner] removed the sheath or case of the knife as he exited the house.

7

After releasing the pitbulls and removing the knife from its sheath, [Petitioner] ran across the street past Erik and rushed Hernandez at full stride.  An altercation then took place between [Petitioner] and Hernandez near Vasquez's car and the lawn of a house across the street from the Saucedas' home.  [Petitioner] and Hernandez were swinging at each other and wrestling on the ground where blood was later found.

Soon thereafter, Luna helped Hernandez to stand up, but Hernandez "wasn't all there."  Luna helped Hernandez walk across the driveway or down the sidewalk to Vasquez's car, and Hernandez got into the back seat of the passenger side of the car.  [Petitioner] leaned into the driver's side window and punched Vasquez in the face. Vasquez testified she glanced at [Petitioner's] right hand, which was on the car door, and saw he was holding a knife which she described as a pocketknife, but she stated she did not get a long look at the knife.

Luna got in the back seat with Hernandez, and Reyes sat in the front passenger seat.  Vasquez was hysterical and could not drive.  Reyes leaned over, put the car in gear, grabbed the steering wheel, stepped on the gas pedal, and drove away.  [Petitioner] fled and was not seen again.

Hernandez was taken to the hospital.  Hernandez was not conscious when they arrived, and he died of a stab wound sometime after 5:00 a.m.

Dr. Mark Fajardo, a forensic pathologist employed by

8

the Riverside County Sheriff-Coroner, performed Hernandez's autopsy and testified that Hernandez suffered two stab wounds in his mid- to lower back, and the fatal wound penetrated about four inches into Hernandez's body, severing the renal artery where it connected to the aorta and resulting in extensive blood loss which was the main cause of death.

At around 11:40 p.m. on the night of the murder, Erik and Cristian discussed the incident with Deputy Dwayne Parrish of the Riverside County Sheriff's Department and showed him where the fight occurred. A pool of blood was found in the sidewalk gutter across the street from the Saucedas' home. Homicide detectives later discovered that blood initially pooled in the front lawn of the house across the street from the Saucedas' home and saturated the grass before running down the driveway and sidewalk into the gutter. No weapons were found at the murder scene.

B. *The Defense Case*

[Petitioner] presented witnesses who indicated he had reasons to be living in Las Vegas at the time of his arrest because his uncle, Delfino Rubi, lived there and [Petitioner] went there to find work.

A captain at the Los Angeles Fire Department who was also a licensed paramedic and had responded to several hundred stabbing scenes testified that significant pooling of blood is not always found at stabbing scenes.

A former gang member testifying as a defense gang

9

1  expert testified that if someone had gang associations 15

2  or 20 years ago, his current possession of gang

3  memorabilia does not necessarily mean he still has ties

4  to the gang.

5  (Lodged Doc. 14 at 2-7 (footnote omitted).)

6  **STANDARD OF REVIEW**

7  Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism

8  and Effective Death Penalty Act of 1996:

9  An application for a writ of habeas corpus on behalf of

10  a person in custody pursuant to the judgment of a State

11  court shall not be granted with respect to any claim that

12  was adjudicated on the merits in State court proceedings

13  unless the adjudication of the claim — (1) resulted in a

14  decision that was contrary to, or involved an

15  unreasonable application of, clearly established Federal

16  law, as determined by the Supreme Court of the United

17  States; or (2) resulted in a decision that was based on

18  an unreasonable determination of the facts in light of

19  the evidence presented in the State court proceeding.

20  Under AEDPA, the "clearly established Federal law" that

21  controls federal habeas review consists of holdings of Supreme

22  Court cases "as of the time of the relevant state-court

23  decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). As the

24  Supreme Court has "repeatedly emphasized, . . . circuit precedent

25  does not constitute 'clearly established Federal law, as

26  determined by the Supreme Court.'" Glebe v. Frost, 135 S. Ct.

27  429, 431 (2014) (per curiam) (quoting § 2254(d)(1)). Further,

28  circuit precedent "cannot 'refine or sharpen a general principle

10

of Supreme Court jurisprudence into a specific legal rule that [the] Court has not announced.'" Lopez v. Smith, 135 S. Ct. 1, 4 (2014) (per curiam) (quoting Marshall v. Rodgers, 133 S. Ct. 1446, 1451 (2013) (per curiam)).

Although a particular state-court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. Williams, 529 U.S. at 391, 412-13.  A state-court decision is "contrary to" clearly established federal law if it either applies a rule that contradicts governing Supreme Court law or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts.  Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (citation omitted).  A state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Id.

State-court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review only "if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law, or based on 'an unreasonable determination of the facts' (emphasis added)."  Id. at 11 (quoting § 2254(d)).  A state-court decision that correctly identifies the governing legal rule may be rejected if it unreasonably applies the rule to the facts of a particular case. Williams, 529 U.S. at 407-08.  To obtain federal habeas relief for such an "unreasonable application," however, a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable."  Id. at 409-10.  In other words,

1   habeas relief is warranted only if the state court's ruling was
2   "so lacking in justification that there was an error well
3   understood and comprehended in existing law beyond any
4   possibility for fairminded disagreement." <u>Harrington v. Richter</u>,
5   562 U.S. 86, 103 (2011).

6       Here, Petitioner raised both claims in the Petition on
7   direct appeal (Lodged Doc. 11), and the court of appeal rejected
8   the state-law aspects of them on the merits in a reasoned
9   decision (Lodged Doc. 14).  The Court assumes any federal claims
10  were also rejected on the merits, <u>see</u> <u>Johnson v. Williams</u>, 133 S.
11  Ct. 1088, 1091-92 (2013), particularly given that Petitioner has
12  not argued otherwise.  The state supreme court summarily denied
13  Petitioner's petition for review.  (Lodged Doc. 16.)  Petitioner
14  then raised claim two in a habeas petition in the state supreme
15  court (Lodged Doc. 6), which summarily denied it (Lodged Doc. 7).
16  The Court therefore "looks through" the supreme court's silent
17  denials to the court of appeal's decision as the basis for the
18  state courts' judgment.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797,
19  803-04 (1991).  Because the court of appeal adjudicated the
20  claims on the merits, the Court's review is limited by AEDPA
21  deference.  <u>See</u> <u>Richter</u>, 562 U.S. at 100.

22                          **DISCUSSION**
23  **I.   Petitioner's Claim Based on Exclusion of "Expert" Evidence**
24  **     Does Not Warrant Habeas Relief**

25      Petitioner claims the trial court violated his
26  constitutional right to due process and to present a defense by
27  excluding the testimony of the defense's proposed knife expert,
28  Brian Xan Martin.  (Mem. P. & A. at 13-25; Reply at 2-7.)

1  Petitioner argues that the "exclusion of Martin's testimony
2  eliminated [Petitioner's] defense, namely that the knife that he
3  was alleged to be carrying" — which he claims had a double-edged
4  wavy or curved blade — "could not have caused the wounds in the
5  victim." (Mem. P. & A. at 15-16.)

6      A.   <u>Applicable Law</u>

7      A defendant generally has a constitutional right to
8  meaningfully present a complete defense in his behalf.  <u>Chambers</u>
9  <u>v. Mississippi</u>, 410 U.S. 284, 294 (1973); <u>see</u> <u>Moses v. Payne</u>, 555
10 F.3d 742, 757 (9th Cir. 2009) (as amended) (defendant's right to
11 present defense stems from both 14th Amendment right to due
12 process and Sixth Amendment right to compel witnesses).  A
13 defendant does not have license to present any evidence he
14 pleases, however; for instance, due process is not violated by
15 the exclusion of evidence that is only marginally relevant,
16 repetitive, or more prejudicial than probative.  <u>Crane v.</u>
17 <u>Kentucky</u>, 476 U.S. 683, 689-90 (1986); <u>see</u> <u>Chambers</u>, 410 U.S. at
18 302 ("[T]he accused, as is required of the State, must comply
19 with established rules of procedure and evidence designed to
20 assure both fairness and reliability in the ascertainment of
21 guilt and innocence."); <u>Taylor v. Illinois</u>, 484 U.S. 400, 410
22 (1988) ("The accused does not have an unfettered right to offer
23 testimony that is incompetent, privileged, or otherwise
24 inadmissible under standard rules of evidence.").

25 Rather, the right is implicated only when exclusionary rules
26 infringe upon a "weighty interest of the accused" and are
27 "'arbitrary' or 'disproportionate to the purposes they are
28 designed to serve.'"  <u>Holmes v. South Carolina</u>, 547 U.S. 319,

324-25 (2006) (citation omitted) (noting that arbitrary rules exclude important defense evidence without legitimate reason); see also Nevada v. Jackson, 133 S. Ct. 1990, 1992-93 (2013) (per curiam) (finding that challenged evidentiary rule was supported by "good reasons" and therefore that its constitutional propriety "cannot be seriously disputed" (alteration omitted)).

The Supreme Court has not yet "squarely addressed" whether a state court's discretionary exclusion of evidence can ever violate a defendant's right to present a defense.  See Moses, 555 F.3d at 758-59 (considering challenge to state evidentiary rule allowing discretionary exclusion of expert testimony favorable to defendant); see also Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011) (noting that no Supreme Court case has squarely addressed issue since Moses); Aguilar v. Cate, 585 F. App'x 450, 450-51 (9th Cir. 2014) ("it is not clearly established that the Due Process Clause of the Fourteenth Amendment prohibits a trial court from excluding defense expert testimony on the unreliability of eyewitness identification"), cert. denied, 135 S. Ct. 1507 (2015).  In fact, existing precedent suggests the opposite.  In Holmes, 547 U.S. at 326, the Court noted that

> [w]hile the Constitution . . . prohibits the exclusion of
> defense evidence under rules that serve no legitimate
> purpose or that are disproportionate to the ends that
> they are asserted to promote, well-established rules of
> evidence permit trial judges to exclude evidence if its
> probative value is outweighed by certain other factors
> such as unfair prejudice, confusion of the issues, or
> potential to mislead the jury.

14

See also Clark v. Arizona, 548 U.S. 735, 789 (2006) ("States have substantial latitude under the Constitution to define rules for the exclusion of evidence and to apply those rules to criminal defendants.").

   B.   Relevant Facts

   At trial, evidence was introduced showing that Erik had told police that on the day of the stabbing, he had seen Petitioner with a knife with a long, curvy, fixed blade, a white handle, and a sheath.   (Lodged Doc. 8, 7 Rep.'s Tr. at 1044, 1049, 1051-53; Lodged Doc. 9, 4 Clerk's Tr. at 921-26.)   Erik drew a picture of the knife for the police.   (Lodged Doc. 8, 7 Rep.'s Tr. at 1049-50.)   During his trial testimony, however, Erik said he had lied to the police about the wavy knife and that Petitioner had had a folding pocketknife clipped to his pocket.   (Lodged Doc. 8, 6 Rep.'s Tr. at 949-51, 7 Rep.'s Tr. at 1048-50.)   The jury also heard Reyes's preliminary-hearing testimony that during the fight, he saw Petitioner come out of the Saucedas' house and remove from a sheath a four-inch, fixed-blade knife with "multiple curves."[5]   (Lodged Doc. 9, 3 Clerk's Tr. at 626-27, 660, 666.)   Vasquez testified that during the fight, a man in a white shirt punched her in the face while she was sitting in the driver's seat of her car; the man was holding a pocketknife, although Vasquez admitted that she didn't get a good look at it.[6]

_____

   [5] Reyes was found to be unavailable to testify at trial, and his preliminary-hearing testimony was read into the record. (Lodged Doc. 8, 4 Rep.'s Tr. at 586-89, 5 Rep.'s Tr. at 605-06; Lodged Doc. 9, 3 Clerk's Tr. at 592, 599-668.)

   [6] Vasquez said a pocketknife was "a knife that you open and close."   (Lodged Doc. 8, 2 Rep.'s Tr. at 268.)

(Lodged Doc. 8, 2 Rep.'s Tr. at 268-74, 3 Rep.'s Tr. at 369.)
Erik testified that he saw Petitioner go up to Vasquez's car
during the fight and make a punching motion through the driver's-
side window.  (Lodged Doc. 8, 7 Rep.'s Tr. at 1034, 1143-46.)  No
one else was seen with a knife on the day of the fight.[7]  (Lodged
Doc. 8, 3 Rep.'s Tr. at 454, 7 Rep.'s Tr. at 1062-64.)

    Dr. Fajardo, a forensic pathologist employed by the
Riverside County Sheriff's Coroner, testified regarding
Hernandez's injuries and cause of death.  When asked whether
there was "any way really of knowing 100 percent what type of
weapon was used" in the stabbing, Dr. Fajardo responded, "No,
absolutely not."  (Lodged Doc. 8, 11 Rep.'s Tr. at 1715.)  He
opined that the stab wounds were "consistent with a single-edged
weapon" because one wound had "an abrasion to the lower margin,
which is oftentimes caused by the dull portion of a single-edged
weapon."  (Id. at 1716.)  But he testified that a double-edged
knife also could have caused Hernandez's wounds because "[t]here
are ways for a double-edged weapon . . . to produce an abrasion,"
such as if the tip or one edge of the weapon is not very sharp.

---

[7] Luna testified that he had had a folding pocketknife in
his pocket the night of the stabbing (Lodged Doc. 8, 3 Rep.'s Tr.
at 403-06), which the police later found in his truck (Lodged
Doc. 8, 12 Rep.'s Tr. at 2099).  Luna testified that he hadn't
realized he had the knife in his pocket until after the police
told him about it.  (Lodged Doc. 8, 3 Rep.'s Tr. at 403-06.)
Luna testified that on the night of the stabbing, he did not tell
anyone in his group that he had the knife, he did not pull it out
at Erik's house, and no one else in his group had a weapon.
(Id. at 404-05.)  The police tested Luna's knife for blood but
did not detect any.  (Lodged Doc. 8, 12 Rep.'s Tr. at 2100-01.)
No one testified that they saw Luna with a knife on the day of
the fight.

16

(Id.)  He further testified that he was "not excluding the possibility of a double edged weapon" and that a wound from a wavy blade would not be different from one from a straight blade. (Id. at 1717.)

Later in the trial, defense counsel asked the court to allow Martin to testify as a "knife expert," about "how a wavy knife would not create the type of stab wound that was found on the victim's body"[8] (Lodged Doc. 8, 12 Rep.'s Tr. at 2028-29) and about "the different kind of knives" and their effect on "wound shape" (id. at 2040-41).  The trial court conducted a California Evidence Code section 402 hearing to determine whether Martin's testimony should be admitted.[9]  (Lodged Doc. 9, 4 Clerk's Tr. at 796.)

At the hearing, Martin testified that he was

> a weapons specialist.  I am a special swordsman. Research history on the subject.  I have been employed at Mesa Cutlery 17 consecutive years as a salesman and representative for 15 to 20 different major brands of

---

[8] Petitioner attached to his Reply Martin's resume, letter to defense counsel with attached drawings, and four-page document comparing single- and double-edged knives.  (Reply, Ex. A.)  It appears that defense counsel relied on these documents during the hearing on Martin.  (See Lodged Doc. 8, 12 Rep.'s Tr. at 2040-41 (defense counsel stating that she was providing prosecutor with two-page copy of Martin's resume, a letter addressed to defense counsel that included drawings, and four-page document with drawings and comparisons of knives "with a copy for the Court itself").)  But in any event, the information is redundant of Martin's testimony at the hearing.

[9] Section 402(b) provides, in relevant part, that "[t]he court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury."

1  cutlery, from kitchen knives, pocket knives, swords,

2  manicure equipment, all the way down.

3       In addition to that, I own and maintain several

4  items of — historical items over a 12-year period and

5  have been collecting knives since I was nine years

6  old . . . .

7  (Lodged Doc. 8, 12 Rep.'s Tr. at 2043.)  He testified that he was

8  on the panel of qualified experts in Orange County.  (Id.)

9       Martin opined that it was "fairly easy to determine" what

10 kind of entry wound a particular type of knife would cause.

11 (Id.)  He testified that "[o]n many occasions" he had "taken

12 several blades and introduced them into the surface of a 10-pound

13 block of clay," which gave "a very clean profile" showing the

14 type of "puncture wound" it would make.  (Id. at 2044.)  Martin

15 described several types of knives and the shape of the openings

16 they made when pushed into clay.  (Id. at 2045-58.)  He also

17 testified that the wavy-bladed knife Erik had drawn for police

18 was a "cris blade," a double-edged knife that would make a

19 diamond-shaped puncture wound.  (Id. at 2048-51.)

20      Martin opined that Hernandez's stab wounds were made by a

21 single-edged knife:

22      [The wound] does not have the characteristic shape of a

23      diamond, which would be indicative of a double-edged

24      blade.  I see a pronounced rounded portion on one area,

25      and a thinner, more-tapered portion on the other.  That

26      suggests to me the similarity to the pie or wedge shaped

27      earlier stab as having been made by various single-edged

28      blades.

18

1   (Id. at 2059.)

2        At the end of the hearing, the trial court denied the

3   defense's request to call Martin as an expert:

4        [T]his is not a close call.   Although there is no

5        question in the Court's mind that Mr. Martin is, indeed,

6        an expert in all — all matters of cutlery, no foundation

7        has been laid in terms of his medical training,

8        background.   In fact, in some ways, I think there would

9        be some misinformation here for the jury, because at this

10       time we don't have the knife that was used to stab the

11       victim.   If we had the knife, and then we were comparing

12       and the foundation has been laid of that, that clay was

13       similar to skin, and then we had photographs that were

14       lined up to show clay to skin, and then had a doctor

15       testify, that would be one thing, but we don't have the

16       knife.

17            The pathologist already said he doesn't know the

18       kind of knife that was used. . . .

19            Clay is one thing.   Skin is another.   I don't have

20       any testimony as to his medical background.   I have no

21       testimony that the clay is similar to skin.   I don't have

22       the knife being used on the clay. . . .

23            Again, I think he is an expert on cutlery.

24            In terms of providing information to this jury about

25       a knife that was used and how it would create a specific

26       kind of injury in a human body, without more, I am just

27       not going to allow it.

28   (Lodged Doc. 8, 12 Rep.'s Tr. at 2060-62.)   The next day, the

19

1  trial court denied defense counsel's request that it reconsider

2  its ruling.  (Lodged Doc. 8, 13 Rep.'s Tr. at 2136-43.)

3       The defense later called as a witness Leonard Scott

4  Gribbons, a captain in the Los Angeles City Fire Department who

5  had spent 23 years working as a "firefighter, paramedic, [and]

6  emergency medical services battalion supervisor and captain."

7  (Lodged Doc. 8, 14 Rep.'s Tr. at 2345-46.)  Gribbons testified

8  that he had responded to "[s]everal hundred" stabbing scenes, and

9  in up to 10 percent of them the stabbings had been fatal.

10 (Id. at 2347.)  After Gribbons testified that he did not always

11 find "significant pooling" of blood at a stabbing scene, defense

12 counsel presented a hypothetical:

13      Let's assume that two individuals get into a fight in the

14      middle of the street.  No weapons are seen.

15           Fighter A knocks down Fighter B.  Fighter B gets up,

16      staggers to the other side of the street.  Fighter B then

17      falls to the ground again.

18 (Id. at 2349.)  Defense counsel asked whether, assuming that

19 "there's very little blood in the middle of the street" and "a

20 pool of blood on the side where [Fighter B] walks over and then

21 falls down again," "is it possible that the stabbing could have

22 occurred in the middle of the street where there's very little

23 blood?"  (Id. at 2350.)  Gribbons replied, "Yes."  (Id.)  Defense

24 counsel further questioned him:

25      Q.   Would it be unusual not to see a pool of blood in

26           the middle of the street under those circumstances?

27      A.   I would not find that to be unusual.  It really

28           . . . depends on the amount of clothing, how long

20

1          the person was down and the position they were in

2          when they were down.   But I wouldn't find it

3          unusual.

4          . . . .

5     Q.   So . . . is it safe to say then that where a pool

6          of blood is when you respond to a stabbing scene is

7          not necessarily where the stabbing occurred?

8     A.   That's correct.

9   (Id. at 2350-51.)

10    C.   Court of Appeal's Decision

11    The court of appeal rejected this claim on direct review:

12         Having reviewed both Martin's testimony and the

13    court's ruling, we conclude the court did not abuse its

14    broad discretion by excluding Martin's testimony because

15    the record shows he was not qualified to testify on the

16    subject to which his testimony related.[FN3]    (See

17    Evid.Code, § 720;[10] People v. Kelly, supra, 17 Cal.3d at

18    p. 39.)  As the court correctly found, the defense failed

19    to lay a foundation that Martin had special knowledge,

21    [10] California Evidence Code section 720 provides as follows:

(a) A person is qualified to testify as an expert if he
has special knowledge, skill, experience, training, or
education sufficient to qualify him as an expert on the
subject to which his testimony relates.    Against the
objection of a party, such special knowledge, skill,
experience, training, or education must be shown before
the witness may testify as an expert.

(b) A witness' special knowledge, skill, experience,
training, or education may be shown by any otherwise
admissible evidence, including his own testimony.

21

1  skill, experience, training, or education sufficient to
2  qualify him as an expert on human stab wounds and,
3  specifically, on how particular knives "would create a
4  specific kind of injury in a human body."  Absent such a
5  foundation, the court's determination that Martin was
6  unqualified was, as the court stated, "not a close call."

7       [FN3] In light of our conclusion that the court did
8          not abuse its discretion, we do not address
9          [Petitioner's] claim that the exclusion of
10         Martin['s] testimony was prejudicial.
11  (Lodged Doc. 14 at 9-10.)

12       D.   Analysis

13       The court of appeal was not objectively unreasonable in
14  rejecting Petitioner's claim.  As discussed above, the Supreme
15  Court has not yet squarely addressed whether a state court's
16  discretionary exclusion of expert testimony can ever violate a
17  defendant's right to present a defense.  See Moses, 555 F.3d at
18  758-59; see also Aquilar, 585 F. App'x at 450-51.  Because the
19  court of appeal's decision therefore could not have contravened
20  clearly established federal law under AEDPA, habeas relief is not
21  warranted.  Id.; see Wright v. Van Patten, 552 U.S. 120, 125-26
22  (2008).

23       In any event, the state court's denial of this claim was not
24  objectively unreasonable because Martin clearly was not qualified
25  to testify as an expert on knife wounds on a human body.  See
26  Taylor, 484 U.S. at 410 ("The accused does not have an unfettered
27  right to offer testimony that is incompetent, privileged, or
28  otherwise inadmissible under standard rules of evidence.").

Martin testified that he was a "weapons specialist" and "special swordsman" who had sold cutlery for 17 years and collected knives since he was a child.  But although Martin apparently was knowledgeable about knives — the trial court acknowledged that he was an "expert on cutlery" — nothing indicated that he had any medical training or experience that would have qualified him to testify regarding stab wounds in human flesh.  Indeed, Martin's testimony regarding stab wounds simply extrapolated from the shapes of holes made when he pushed knives into blocks of clay, and nothing, other than Martin's conclusory testimony, showed that a human body would display the same entry shapes when stabbed with a knife.  See Quintero v. Long, No. 1:13-CV-01251-JLT, 2015 WL 7017004, at *10 (E.D. Cal. Nov. 12, 2015) (finding that state court reasonably determined that expert's "experience in the a [sic] military services, as a deputy sheriff who attended autopsies, and as the owner of an 'academy' teaching self-defense might qualify him as an expert in law enforcement issues, but did not qualify him as an expert in medical matters such as the amount of force necessary to break ribs").[11]  By contrast, Dr. Fajardo, a medical doctor who had

---

[11] Petitioner argues that the trial court "ignore[d] multiple instances where the expert testified about markings in clay and clearly testified that skin would act similarly" (Mem. P. & A. at 15; Reply at 2), pointing to Martin's testimony that holes made by knives plunged into clay would have the "same profile" as a "puncture wound" (Lodged Doc. 8, 12 Rep.'s Tr. at 2044, 2052).  But nothing shows that the trial court ignored that testimony — rather, it reasonably concluded that Martin's experience as a cutlery salesman and knife collector did not qualify him to testify that clay and skin behave similarly when stabbed with a knife.  (Lodged Doc. 8, 12 Rep.'s Tr. at 2060-61.)

1   undergone years of training in forensic pathology, testified that

2   Hernandez's stab wounds could have been inflicted by a single-

3   edged knife or a double-edged knife that was dull at the tip or

4   on one side and that it was impossible to conclusively determine

5   what kind of knife the killer had used.

6        Petitioner, moreover, was provided a full opportunity to

7   present a defense that he was not the stabber.  This contrasts

8   sharply with the defendant in Holmes, who was precluded entirely

9   from presenting his theory that a third party was the

10  perpetrator.  See Holmes, 547 U.S. at 323-24.  The defense called

11  Captain Gribbons, who testified that Hernandez could have been

12  stabbed in the middle of the street, where he and Erik had been

13  fighting, rather than on the grass, where he had fought with

14  Petitioner and where the pool of blood was found.  Defense

15  counsel also fully questioned Dr. Fajardo during cross- and

16  recross-examination (Lodged Doc. 8, 11 Rep.'s Tr. at 1724-39,

17  1743-44), eliciting his testimony that Hernandez's injuries were

18  "most consistent" with a single-edged knife (id. at 1732) and

19  that when a dull knife is used for a stabbing, it would often

20  result in tearing and collapsing of the skin, which was not

21  present in Hernandez's wounds (id. at 1734-35).  She also

22  elicited Dr. Fajardo's admission that he had recently discussed

23  with the prosecution the "issue about one side [of the knife]

24  being blunt and one side being sharp." (Id. at 1738.)  Defense

25  counsel fully cross-examined Erik about his inconsistent

26  statements to police and elicited his testimony that he didn't

27  tell the police that Petitioner had had a knife until after they

28  implied that Erik or his brother could be charged with the

24

1  murder.  (Lodged Doc. 8, 7 Rep.'s Tr. at 1096-100.)

2      Defense counsel also argued extensively during closing that

3  no direct evidence showed that Petitioner was the stabber.  (See,

4  e.g., Lodged Doc. 8, 15 Rep.'s Tr. at 2634, 2636-37.)  She

5  pointed to Dr. Fajardo's testimony that "the wounds that

6  [Hernandez] sustained were blunt on one side and sharp on the

7  other, and that was most consistent with a single-edged knife."

8  (Id. at 2676.)  She also highlighted Erik's statements that he

9  did not see Petitioner with a knife during the fight (id. at

10 2667) and various inconsistencies in Erik's statements to police

11 (id. at 2667-70, 2674-75).  She stated that

12         Erik's testimony simply cannot be . . . believed.  He is

13         the only person linking [Petitioner] to George Hernandez.

14         . . . [W]hen he's threatened and told he's going to be

15         charged, of course, he's now going to put it on someone

16         else.

17 (Id. at 2670; see also id. at 2689-91 (laying out theory in which

18 Erik most likely stabbed Hernandez, stating "[n]o one except for

19 Erik in that final police interview where he's threatened that he

20 could be the suspect in this case, no one else puts [Petitioner]

21 with [Hernandez]").)  Defense counsel emphasized that "many

22 people [were] present that night" and "anybody could have

23 [stabbed Hernandez]."  (Id. at 2681-82.)  As such, Petitioner was

24 afforded a full opportunity to present his defense that someone

25 else was the stabber.

26     Finally, even if the trial court erred in excluding Martin's

27 testimony, it did not have a substantial and injurious effect on

28 the verdicts.  See Brecht v. Abrahamson, 507 U.S. 619, 638

                              25

1   (1993); cf. Cudjo v. Ayers, 698 F.3d 752, 768-70 (9th Cir. 2012)

2   (applying Brecht after finding Chambers error).  Only Petitioner

3   was seen with a knife before and during the fight, and a pool of

4   blood was found in the area where Petitioner and Hernandez had

5   fought and wrestled.  (Lodged Doc. 8, 9 Rep.'s Tr. at 1395-99.)

6   One witness who saw Petitioner with the knife, Reyes, was friends

7   with Hernandez and Luna and went with them to confront Erik, and

8   another, Vasquez, was Reyes's girlfriend.  As such, they had no

9   reason to deflect the blame from Erik.  Petitioner fled after the

10  fight and was not located until he was arrested in Las Vegas.

11  (Lodged Doc. 8, 5 Rep.'s Tr. at 669, 767-68, 771, 6 Rep.'s Tr. at

12  891-93, 7 Rep.'s Tr. at 1037-39, 8 Rep.'s Tr. at 1317, 1321, 9

13  Rep.'s Tr. at 1404.)  Moreover, the murder weapon was never

14  found, and witnesses gave conflicting testimony regarding the

15  type of knife Petitioner had carried.  Thus, Martin's opinion

16  that Hernandez's wound was caused by a single-bladed knife would

17  not necessarily have excluded Petitioner as the stabber.  Dr.

18  Fajardo had already testified that the stab wounds were

19  "consistent with a single-edged weapon" or a dull double-edged

20  weapon.  (Lodged Doc. 8, 11 Rep.'s Tr. at at 1716-17.)  And

21  Petitioner presented significant other evidence that Erik was the

22  stabber, including Gribbons's testimony, and the jury apparently

23  rejected it.  Thus, given the substantial evidence that

24  Petitioner stabbed Hernandez with either a single- or double-

25  edged knife and that either type of knife could have been used in

26  the stabbing, any error in excluding Martin's testimony could not

27  have significantly affected the jury's verdict.

28       Habeas relief is not warranted on this ground.

26

**II.  Petitioner's Sufficiency-of-the-Evidence Claim Does Not Warrant Habeas Relief**

Petitioner claims that insufficient evidence supported the jury's finding that Hernandez's murder was willful, deliberate, and premeditated.  (Pet. at 6; Mem. P. & A. at i, 26-38.)

A.   <u>Applicable Law</u>

The Due Process Clause of the 14th Amendment of the U.S. Constitution protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  Thus, a state prisoner who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim.  <u>Herrera v. Collins</u>, 506 U.S. 390, 401-02 (1993).

In considering a sufficiency-of-the-evidence claim, a court must determine whether, "after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original).  California's standard for determining the sufficiency of evidence to support a conviction is identical to the federal standard enunciated in <u>Jackson</u>.  <u>People v. Johnson</u>, 26 Cal. 3d 557, 576 (1980).  On federal habeas review, a state court's resolution of a sufficiency-of-the-evidence claim is evaluated under 28 U.S.C. § 2254(d)(1) rather than § 2254(d)(2).  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274-75 (9th Cir. 2005) (as amended).

<u>Jackson</u> "makes clear that it is the responsibility of the

27

1   jury — not the court — to decide what conclusions should be drawn

2   from evidence admitted at trial." Cavazos v. Smith, 132 S. Ct.

3   2, 3-4 (2011) (per curiam).  Thus, the reviewing court "cannot

4   second-guess the jury's credibility assessments"; such

5   determinations are "generally beyond the scope of review." Kyzar

6   v. Ryan, 780 F.3d 940, 943 (9th Cir.) (citation omitted), cert.

7   denied, 136 S. Ct. 108 (2015).

8        The reviewing court "must look to state law for 'the

9   substantive elements of the criminal offense,'" although the

10  "minimum amount of evidence that the Due Process Clause requires

11  to prove the offense is purely a matter of federal law." Coleman

12  v. Johnson, 132 S. Ct. 2060, 2064 (2012) (per curiam) (quoting

13  Jackson, 443 U.S. at 324 n.16).

14       Under California law, a "willful, deliberate, and

15  premeditated killing" constitutes first-degree murder.  Cal.

16  Penal Code § 189.  As set forth in People v. Anderson, 70 Cal. 2d

17  15, 26-27 (1968), courts assessing the sufficiency of evidence to

18  sustain a finding of deliberation and premeditation look at

19  planning activity, motive, and the manner of killing if it

20  indicates a preconceived design to take the victim's life.

21  People v. Edwards, 54 Cal. 3d 787, 813 (1991); see also Davis v.

22  Woodford, 384 F.3d 628, 640-41 (9th Cir. 2003) (as amended)

23  (assessing Anderson factors in determining whether jury finding

24  of premeditation and deliberation was supported by sufficient

25  evidence).

26

27

28

1       B.   Court of Appeal's Decision

2       The court of appeal found that all three Anderson factors

3  pointed to premeditation:

4           Viewing the evidence in the light most favorable to

5       the judgment, we conclude substantial evidence supports

6       the jury's finding that [Petitioner] murdered Hernandez

7       with premeditation and deliberation.  With respect to the

8       first Anderson factor, substantial evidence supports a

9       reasonable inference that [Petitioner] planned his murder

10      of  Hernandez  and,  in  so  doing,  killed  him  with

11      premeditation  and  deliberation.   [Petitioner]  joined

12      Cristian  and  Erik,  who  had  a  BB  gun,  in  front  of  the

13      Saucedas'  house  during  the  initial  confrontation  with

14      Hernandez  and  his  friends.   [Petitioner]  went  back  into

15      the house and, holding a knife, brought the Saucedas' two

16      pitbulls to the front door.  During a recorded interview,

17      Erik told detectives, "I ain't gonna take this fucking

18      rap.  This fool [[Petitioner]] had a knife there."  The

19      record shows no one else was seen in possession of a

20      knife at the scene of the murder that day.  A defendant's

21      act  of  arming  himself  with  a  knife  is  evidence  of

22      planning  activity  for  purposes  of  determining  whether

23      substantial  evidence  supports  the  jury's  finding  of

24      premeditation and deliberation.  (People v. Perez, supra,

25      2 Cal.4th at p. 1126.)

26      The trial record shows that after [Petitioner] armed

27      himself with the knife, he released the pitbulls, removed

28      the  knife  sheath  or  case  as  he  exited  the  house,  ran

                                    29

across the street past Erik, and rushed Hernandez at full stride.   He and Hernandez swung at each other and wrestled on the ground where blood was later found.

The process of premeditation does not require any extended period of time, and the true test is not the duration of time as much as it is the extent of the reflection.   (*People v. Harris* (2008) 43 Cal.4th 1269, 1286.)  Here, the foregoing substantial evidence supports a reasonable inference that [Petitioner's] killing of Hernandez was the result of planning and "preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*People v. Perez*, supra, 2 Cal.4th at p. 1125.) [Petitioner] armed himself with the sheathed knife and two pitbulls only after the initial confrontation took place in front of the Saucedas' house.  He had sufficient time to reflect upon what he was doing.   Before he attacked and fatally stabbed Hernandez, [Petitioner] had to perform the additional intentional act of removing the sheathing from the murder weapon.   In sum, the prosecution presented ample evidence of planning activity.

Regarding the second *Anderson* factor, substantial evidence supports a reasonable inference that [Petitioner] had a *motive* to kill Hernandez.  Hernandez was a close friend of Reyes, who was an active member of the TSK graffiti tagging crew.   [Petitioner] and Erik were friends.  Erik and his brother, Cristian, associated with members of the rival OCP tagging crew.  OCP graffiti

30

was found on a tequila bottle at the Villalobos family's three-bedroom residence — where [Petitioner] had lived and where he kept clothing and other personal items — during the execution of a lawful search warrant. His father testified he did not know what OCP was, and he would be surprised if there was graffiti in the house with the initials "OCP." Hernandez was with Reyes and Luna when they confronted Erik in front of Erik's home — in the presence of [Petitioner] and Cristian — the night of the murder and accused Erik of being involved in the tagging of Martinez's home. As shown by the opinion testimony of gang expert Nelson Gomez in response to a hypothetical question by the prosecutor, [Petitioner's] actions demonstrated a desire to align himself with the OCP and gain its respect. In sum, substantial evidence supports reasonable inferences that [Petitioner] had a motive to kill Hernandez and he did kill Hernandez with premeditation and deliberation.

Regarding the third Anderson factor, [Petitioner's] *manner* of killing Hernandez also supported a reasonable inference that [Petitioner] killed him with premeditation and deliberation. The focused infliction of injuries to a vital part of the victim's body is method evidence for purposes of determining whether substantial evidence supports the jury's finding of premeditation and deliberation. (See People v. Harris, supra, 43 Cal.4th at p. 1287 [stabbing in the area of the victim's heart with sufficient force to pierce the heart]; People v.

Thomas (1992) 2 Cal.4th 489, 518 [shooting victims in the head].)  Here, as shown by the pathologist's testimony that the fatal stabbing wound penetrated four inches into Hernandez's body and severed the renal artery, [Petitioner] inflicted Hernandez's wounds in "a method sufficiently '"particular and exacting"' to warrant an inference that [he] was acting according to a preconceived design." (People v. Thomas, at p. 518, quoting People v. Caro (1988) 46 Cal.3d 1035, 1050, disapproved on another ground in People v. Bonillas (1989) 48 Cal.3d 757, as stated in People v. Whitt (1990) 51 Cal.3d 620, 657, fn. 29.)  The jury could reasonably infer from [Petitioner's] manner of killing Hernandez that he premeditated and deliberated the murder.

Considering all three Anderson factors and the entire record, we conclude substantial evidence supports the jury's finding that [Petitioner] premeditated and deliberated his murder of Hernandez.  To the extent [Petitioner] points to contrary evidence and contrary inferences to support his claim there is insufficient evidence to support a finding of premeditation and deliberation, he misapplies the substantial evidence standard of review discussed, *ante*.  We conclude [Petitioner] has not carried his burden to affirmatively show on appeal that there is insufficient evidence to support the judgment.

(Lodged Doc. 14 at 12-16.)

32

1          C.   <u>Analysis</u>

2          The court of appeal's rejection of Petitioner's sufficiency-

3     of-the-evidence claim was not objectively unreasonable.   As the

4     court found, the record contains evidence of all three <u>Anderson</u>

5     factors.

6          First, the evidence was sufficient for a rational trier of

7     fact to find that Petitioner had a motive to kill Hernandez.

8     Petitioner had connections to the OCP tagging crew: he was

9     friends with Erik (Lodged Doc. 8, 6 Rep.'s Tr. at 833-34), who

10    associated with OCP members, may have participated in a drive-by

11    shooting with them, and had a "beef" with at least one member of

12    TSK (Lodged Doc. 8, 3 Rep.'s Tr. at 385-87 (Luna's testimony that

13    Erik associated with OCP members and that Erik and other "people

14    that were involved with OCP" drove by Luna's friend's house and

15    shot gun into air), 387-88 (Luna's testimony that OCP tagged

16    Martinez's house), 399 (Luna's testimony that he believed Erik

17    was involved in shooting in front of friend's house and tagging

18    of Martinez's house), 6 Rep.'s Tr. at 939-41 (Erik's testimony

19    that he was friends with OCP members and they would "take it to

20    my house and drink or something"), 8 Rep.'s Tr. at 1207-08

21    (Erik's testimony that he had a "beef" with TSK member)).   Erik's

22    brother, Cristian, was also friends with OCP associates (Lodged

23    Doc. 8, 6 Rep.'s Tr. at 832-33), and Luna told police that OCP

24    members "h[u]ng out" at the Saucedas' home on Torn Ranch Street

25    (Lodged Doc. 9, 3 Clerk's Tr. at 556-58).[12]   And a tequila bottle

26

27    ───────────────

28         [12] Luna's statement to the police was played for the jury.
      (<u>See</u> Lodged Doc. 8, 3 Rep.'s Tr. at 468-72.)

                                   33

with gang and "OCP" graffiti on it was found in a trash can at Petitioner's parents' house (Lodged Doc. 8, 11 Rep.'s Tr. at 1757-61, 12 Rep.'s Tr. at 1903-04, 1937, 1939, 2013-14, 2026), where Petitioner had previously lived and where he still visited and stored some of his belongings (Lodged Doc. 8, 11 Rep.'s Tr. at 1747-48).[13]

The evidence showed that Hernandez and his two companions, Reyes and Luna, were aligned with OCP's rival, TSK. (Lodged Doc. 8, 6 Rep.'s Tr. at 833-34 (Cristian's testimony that OCP and TSK were rivals); Lodged Doc. 9, 3 Clerk's Tr. at 602-03 (Reyes's testimony that OCP and TSK "don't get along").) Vasquez, Reyes's girlfriend, testified that Reyes was a member of TSK and was actively involved in tagging (Lodged Doc. 8, 2 Rep.'s Tr. at 230), and Reyes testified at the preliminary hearing that he was friends with TSK members (Lodged Doc. 9, 3 Clerk's Tr. at 602-03). The night of the stabbing, Hernandez, Reyes, and Luna went to Martinez's house and used spray paint to cover up OCP graffiti. (Lodged Doc. 8, 2 Rep.'s Tr. at 231-35 (Vasquez's testimony), 3 Rep.'s Tr. at 396, 398-400 (Luna's testimony); Lodged Doc. 9, 3 Clerk's Tr. at 556 (Luna's statement to police that Martinez's house had been tagged with "TRS" and "OCP"), 609-11 (Reyes's testimony at preliminary hearing that he, Hernandez, and Luna went to Martinez's house to cover up "OCP" and "TRS"

---

[13] Erik, moreover, testified that Petitioner "went home three times" on the day of the stabbing. (Lodged Doc. 8, 7 Rep.'s Tr. at 1064.) Erik likely referred to Petitioner's parents' home, which was three or four blocks from Torn Ranch Road in Lake Elsinore, where the Saucedas lived, because Petitioner was at that time staying with friends in Corona and did not have a car. (Lodged Doc. 8, 11 Rep.'s Tr. at 1746-47.)

graffiti).)   Immediately afterward, at around 11 or 11:30 that night, they went to Erik's house and confronted him about the OCP graffiti on Martinez's house. (Lodged Doc. 8, 3 Rep.'s Tr. at 406, 424-25 (Luna's testimony), 6 Rep.'s Tr. at 843-44, 879 (Cristian's testimony), 959, 966-67 (Erik's testimony); Lodged Doc. 9, 3 Clerk's Tr. at 618-19, 622 (Reyes's testimony at preliminary hearing).)

Erik testified that he was angry that Hernandez and his friends were at his house late at night because it was disrespectful to his family (Lodged Doc. 8, 6 Rep.'s Tr. at 958, 967), and that after he told them to leave, Hernandez hit him twice and the two of them started fighting (Lodged Doc. 8, 6 Rep.'s Tr. at 966-67; see also Lodged Doc. 9, 3 Clerk's Tr. at 622-23 (Reyes's testimony at preliminary hearing that Erik and Hernandez stepped away to talk but then started fighting)). And Detective Nelson Gomez, a gang expert, testified in response to a hypothetical question that if a person was friends with OCP associates and hanging out at their house when associates of a rival crew arrived and a fight broke out, and the person then joined the fight, he would be "doing that for purposes of aligning [himself] with that particular tagging crew" and to "earn more respect" from the crew. (Lodged Doc. 8, 12 Rep.'s Tr. at 1937-38, 1954-56.)

A reasonable juror could conclude from that evidence that Petitioner was motivated to kill Hernandez because Hernandez associated with members of TSK, OCP's rival; Hernandez had disrespected Petitioner's friend, Erik, by going to his home late at night and confronting him about the OCP graffiti; and

Petitioner wanted to align himself with OCP and gain respect from its members.  See Torres v. Montgomery, No. EDCV 14-2510-AB (RAO), 2015 WL 9684912, at *8 (C.D. Cal. Oct. 9, 2015) (finding that petitioner had "a motive to kill the person or persons who were responsible for disrespecting [petitioner's brother] because it would gain him status and respect in his gang"), accepted by 2016 WL 107904 (C.D. Cal. Jan. 7, 2016); Hernandez v. Barnes, No. CV 12-8893-JVS (KS), 2016 WL 721371, at *6 (C.D. Cal. Jan. 8, 2016) (evidence sufficient to show motive when petitioner was Dallas Cowboys fan and wearing team clothing when victim said he was Raiders fan and "talk[ed] shit" to petitioner), accepted by 2016 WL 738270 (C.D. Cal. Feb. 23, 2016).

The record also contains evidence from which a rational juror could infer that Petitioner planned to kill Hernandez, the second Anderson factor.  Petitioner was with Erik and Cristian during the initial confrontation on the porch.  (Lodged Doc. 8, 2 Rep.'s Tr. at 247-48, 3 Rep.'s Tr. at 417-18, 445, 5 Rep.'s Tr. at 629, 6 Rep.'s Tr. at 846-49, 877, 8 Rep.'s Tr. at 1359-60; Lodged Doc. 9, 3 Clerk's Tr. at 621-22.)  After fighting broke out, Petitioner returned to the house and emerged with the Saucedas' two pit bulls and a knife.  (Lodged Doc. 9, 3 Clerk's Tr. at 626-27, 655; Lodged Doc. 8, 5 Rep.'s Tr. at 644-46, 688, 757-58, 8 Rep.'s Tr. at 1311, 1370-71, 10 Rep.'s Tr. at 1527-28, 1552.)  Petitioner released the pit bulls (Lodged Doc. 8, 5 Rep.'s Tr. at 646, 689, 757, 7 Rep.'s Tr. at 1002-03), unsheathed the weapon (Lodged Doc. 9, 3 Clerk's Tr. at 660-61), ran at Hernandez as he walked away from the fighting and toward a neighbor's house, and fought and wrestled with him in the area

where a pool of blood was later found (Lodged Doc. 8, 2 Rep.'s
Tr. at 263-64 (Vasquez's testimony that Hernandez got up and
walked in front of her car and toward grass or driveway area in
front of neighbor's house across street), 5 Rep.'s Tr. at 758
(Manuel's testimony that Petitioner ran from house to join
fight), 6 Rep.'s Tr. at 976-82 (Erik's testimony that while
Hernandez was dazed and walking away from fight and toward
neighbor's house across street, Petitioner ran past Erik and
began wrestling with and hitting Hernandez), 7 Rep.'s Tr. at 997-
98, 1012, 1016-17 (Erik's testimony that Petitioner ran from
direction of Saucedas' house and past Erik to square off with
Hernandez while he was walking away), 10 Rep.'s Tr. at 1527-28
(Gomez's testimony that Petitioner ran from Saucedas' house to
middle of street), 9 Rep.'s Tr. at 1395-99 (Deputy Dwayne Kenneth
Parrish's testimony that he found "a big pool of blood" in
gutter)).

        Based on the evidence that Petitioner went in the house and
returned to the fight with the pit bulls, armed himself with a
knife, released the pit bulls, unsheathed the knife, and ran with
the knife toward Hernandez as he walked toward the car, a
rational fact-finder could conclude that Petitioner planned to
kill Hernandez.  See Jones v. Wood, 207 F.3d 557, 564 (9th Cir.
2000) (rejecting petitioner's claim of insufficient evidence of
premeditation of murder in part because of planned procurement of
weapon); Hernandez, 2016 WL 721371, at *6 (evidence sufficient to
show planning when petitioner "left the safety of his car,"
returned to bar to fight victim, and "had a six-inch knife in his
back pocket, indicating he had considered the possibility of a

violent encounter that night" (citation omitted)); <u>Mascarenas v.
Long</u>, No. EDCV 13-1109-BRO JEM, 2013 WL 6255253, at *11 (C.D.
Cal. Dec. 3, 2013) (finding that "the jury could reasonably infer
prior planning because petitioner was armed with a knife when the
incident occurred" and collecting cases).

Finally, the manner in which Petitioner killed Hernandez
supports an inference of premeditation.  As Hernandez walked away
from the fight, Petitioner ran at him with the unsheathed knife
and stabbed him twice in a "vital part" of his body — the kidney
area of his mid to lower back — using enough force each time to
penetrate four inches deep.  (Lodged Doc. 8, 11 Rep.'s Tr. at
1712-14, 1719.)  One of those stabs severed the renal artery at
the aorta, causing Hernandez to bleed to death.  (<u>Id.</u> at 1719-
22.)  A reasonable jury could infer from Petitioner's manner of
stabbing Hernandez that he had a deliberate intent to kill.  <u>See
Torres</u>, 2015 WL 9684912, at *8 (finding that "the manner of the
stabbings — more than once in a vital area of each victim's body,
the abdomen — was a method tending to establish a preconceived
design to kill"); <u>Hernandez</u>, 2016 WL 721371, at *6 (manner of
killing supported finding of premeditation and deliberation when
petitioner continued fight after victim was pinned and trying to
escape and petitioner stabbed and cut victim multiple times);
<u>Mascarenas</u>, 2013 WL 6255253, at *11 ("the fact that Petitioner
stabbed the victim in the neck — a vital part of the body —
demonstrates a deliberate intent to kill"); <u>see also</u> <u>Pasillas v.
Miller</u>, No. CV 13-4567, 2015 WL 1085019, at *4 (C.D. Cal. Mar.
10, 2015) (jury's finding of premeditation and deliberation
supported by sufficient evidence when petitioner possessed knife

38

1   at nightclub, was responding to victim's offensive photo-taking

2   of petitioner's dance partner, crossed the dance floor, and

3   carried out "calculated approach and attack" on victim by

4   slashing his neck).

5       Petitioner argues that "no evidence" showed that he knew

6   Hernandez and his companions were coming to the Saucedas' house

7   or that he "had any plan to fight or stab Hernandez before

8   Hernandez drove to the house" (Mem. P. & A. at 29); rather, the

9   stabbing was simply a "rash impulse during a violent fistfight"

10  (id. at 31; see also Reply at 13-14 (arguing that he did not arm

11  himself and seek out Hernandez and that Hernandez and his friends

12  started the fight)).  But "[p]remeditation and deliberation can

13  occur in a brief interval" after a triggering event, such as the

14  initial confrontation with Hernandez, Reyes, and Luna;

15  "[t]houghts may follow each other with great rapidity and cold,

16  calculated judgment may be arrived at quickly." People v.

17  Mendoza, 52 Cal. 4th 1056, 1069 (2011) (citation omitted).  In

18  any event, Petitioner's arguments amount to a request that the

19  Court reweigh the evidence and credibility of the witnesses.  But

20  that the Court cannot do.  Smith, 132 S. Ct. at 7 n.* (reweighing

21  of evidence precluded by Jackson); Bruce v. Terhune, 376 F.3d

22  950, 957 (9th Cir. 2004) (per curiam) (on federal habeas review,

23  jury's credibility determinations entitled to "near-total

24  deference," and court must presume jury resolved conflicts in

25  favor of prosecution).

26      "Jackson claims face a high bar in federal habeas

27  proceedings because they are subject to two layers of judicial

28  deference." Johnson, 132 S. Ct. at 2062.  Petitioner has not

                                    39

surmounted this "twice-deferential standard."  <u>Parker v.</u>
<u>Matthews</u>, 132 S. Ct. 2148, 2152 (2012) (per curiam).  The court
of appeal reasonably found that the evidence was sufficient to
support the jury's finding that Petitioner premeditated the
murder of Hernandez.  Accordingly, Petitioner is not entitled to
habeas relief on this ground.

**III. Petitioner's Request for an Evidentiary Hearing Is Denied**

Petitioner seeks an evidentiary hearing.  (Mem. P. & A. at
39.)  But an evidentiary hearing is not required on issues that
can be resolved by reference to the state-court record under
§ 2254(d), as all of Petitioner's claims can be.  <u>Cullen v.</u>
<u>Pinholster</u>, 563 U.S. 170, 183 (2011) ("[W]hen the state-court
record 'precludes habeas relief' under the limitations of
§ 2254(d), a district court is 'not required to hold an
evidentiary hearing.'" (quoting <u>Schriro v. Landrigan</u>, 550 U.S.
465, 474 (2007))).  Thus, his request for an evidentiary hearing
is denied.

CONCLUSION

IT THEREFORE IS ORDERED that the Petition is DENIED,
Petitioner's request for an evidentiary hearing is DENIED, and
judgment be entered dismissing this action with prejudice.


DATED: April 29, 2016

JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE